Filed 6/30/21  Hill v. City of Richmond CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| ANDRE HILL,<br><br>          Petitioner and Appellant,<br><br>v.<br><br>CITY OF RICHMOND et al.,<br><br>          Respondent. | A159322<br><br>(Contra Costa County<br>Super. Ct. No. N18-1677) |

Appellant Andre Hill, formerly a lieutenant with the Richmond Police Department, appeals from the denial of his petition for a writ of administrative mandamus challenging the disciplinary action, dismissal, taken against him for a "sexting" relationship with an 18-year old, Jasmin Abuslin, that occurred over the course of four months via his personal cell phone (the vast majority of which occurred off-duty) and engaging in one sexual encounter with Abuslin (which also occurred off-duty).

The administrative investigator, the Police Chief, the *Skelly* hearing officer, and the Administrative Law Judge (ALJ) all concluded Hill's conduct violated various provisions of the Police Department Policy Manual, principally the provisions concerning the use of personal communication devices and "conduct unbecoming" an officer.  The Police Chief, the *Skelly* hearing officer, and the ALJ also all concluded dismissal was not warranted (the investigator did not make a recommendation as to discipline), given

1

Hill's unblemished, 22-year career with the department, the short duration of the misconduct, that nothing Hill did was unlawful, and that Hill ended the relationship when he became aware Abuslin used illegal drugs. However, at each step of the administrative process, the city manager overruled the disciplinary recommendation, and eventually terminated Hill's employment. The trial court denied Hill's writ petition. We affirm.

## BACKGROUND

*Administrative Investigation*

In June 2016, Richmond Police Sergeant Stina Johanson conducted an administrative investigation of five allegations against Hill: (1) that he engaged in sexual text messaging (sexting) with Jasmine Abuslin between December 26, 2015 and April 25, 2016, on-and off-duty, using his personal cell phone; (2) that he engaged in this sexting with knowledge Abuslin was a prostitute; (3) that he engaged in oral sex with Abuslin on March 24, 2016 while he was off-duty; (4) that he engaged in this act of oral sex knowing Abuslin was a prostitute; and (5) he engaged in this conduct with Abuslin in exchange for confidential police information, non-enforcement of prostitution laws, and/ or other unauthorized police considerations.[1]

Sergeant Johanson found only the first and third allegations to be sustained. As to the second and fourth allegations, she found Hill did not know Abuslin was a prostitute, concluding the allegations were "[n]ot

---

[1] These allegations were made in the wake of an investigation by the Oakland Police Department (Oakland PD) into relationships between Abuslin and a number of Oakland police officers. During that investigation, the messages between Abuslin and Hill came to light and were referred to the Richmond Police Department.

[s]ustained."[2] As to the fifth allegation, she found Hill did not engage in either the sexting or the oral sex in exchange for any confidential information or special treatment by law enforcement, concluding this allegation was "[u]nfounded."[3]

As to the first allegation, of sexting, Sergeant Johanson found as follows: Abuslin initiated communication with Hill. "She located him via RPD Chief Allwyn Brown's Facebook page," and began communicating with him by "private messenger."[4] "[S]hortly thereafter, they exchanged cell phone numbers." There were over 324 text messages between Hill and Abuslin, "occurring both on and off duty." The vast majority of these communications occurred while Hill was off-duty. Johanson identified five provisions of the Richmond Police Department Policy Manual (Policy Manual) that were implicated.[5]

---

[2] Sergeant Johanson credited Hill's statement that he did not become aware Abuslin was a prostitute until hearing news stories of the Oakland PD investigation.

[3] At the time of the events at issue, Hill was in his mid-forties and single.

[4] Abuslin explained she "would search under friends [on known police officer's Facebook pages] and locate other officers and then 'friend' them on Facebook."

[5] These were:

*Code of Ethics*: "I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency."

*Section 340.3.2(u) Conduct Unbecoming*: "Prohibits criminal, dishonest, infamous or disgraceful conduct adversely affecting the employee/employer relationship, whether on- or off-duty."

*Section 340.3.2 (ag) Conduct Unbecoming*: "Prohibits any other on-duty or off-duty conduct which an employee knows or reasonably should know is unbecoming a member of the Department or which is contrary

As to the fourth allegation, Sergeant Johanson found: Following numerous text messages, which included Abuslin "telling Hill what she could do for him sexually," Abuslin "eventually" asked Hill "to engage in sex with her." Hill agreed to do so about a week before the March 24th encounter. That night, after Hill was off-duty, he drove to Abuslin's house in his personal vehicle, arriving at approximately 8:00 p.m. Hill insisted that Abuslin produce proof confirming she was, as she claimed, 18 years old, which she did. They engaged in oral copulation. Hill recalled the encounter lasted about 15 minutes; Abuslin thought it lasted approximately an hour. Abuslin and Hill both stated the encounter was consensual and no money was exchanged.[6] After the March 24th encounter, Abuslin became "provocative and possessive" and Hill "backed off" communicating with her. Abuslin then began to "harass" him with a barrage of sexually explicit texts. In mid-April, Hill deleted Abuslin from his Facebook page and deleted all

to good order, efficiency or morale, or which tends to reflect unfavorably upon the Department or its members."

*Section 702.6(c) Use of Personal Communication Devices*: "A PCD may not be used to conduct personal business while on-duty, except for brief personal communications (e.g., informing family of extended hours). Employees shall endeavor to limit their use of PCD's to authorized break times, unless an emergency exists."

*Section 702.6(g) Use of Personal Communication Devices*: "Using PCD's to harass, threaten, coerce or otherwise engage in inappropriate conduct with any third party is prohibited."

[6] Prior to this encounter, Abuslin told Hill to drive by her house, stating she would stand at the window and "flash" her breasts. Hill did so; he was again off-duty and in his private vehicle.

4

communications.  Sergeant Johanson identified three provisions of the Policy Manual that were implicated.[7]

*Police Chief's Disciplinary Recommendation*

The Chief of Police, Allwyn Brown, reviewed Sergeant Johanson's investigative report, trusted the findings she made, and accepted them.  He considered a number of factors in making his disciplinary recommendation. These included: 1) the nature and frequency of Hill's interactions with Abuslin (which were sporadic); 2) whether Hill had contact with Abuslin before she turned 18 (he did not); 3) whether confidential information was exchanged for sexual contact (it was not); 4) whether the sexual contact was consensual (it was); 5) whether Hill was aware Abuslin was a prostitute (he was not); 6) whether Hill was aware Abuslin used illegal drugs (he was not); and 7) whether Hill had improperly run Abuslin's name on the confidential database (he had not).  Brown also took into account that Hill met with Abuslin on only one occasion, and after learning she was using drugs, distanced himself from her.  He did not give much weight to the text messaging because it was done on Hill's personal phone and mainly while off-duty.  "He tries not to get involved in officers' personal lives."

Brown also took into account that Hill "had a long history with the Department as a reliable, dependable employee."  He did not believe the evidence demonstrated any predatory behavior by Hill.  "Based on his 33 years of experience, his knowledge of [Hill's] history with the Department and his review of the investigation report," Brown recommended that Hill be suspended for 120 hours without pay.

---

[7]  These were the Code of Ethics concerning private life (quoted above in fn. 5) and the two section 340.3.2 conduct unbecoming provisions (also quoted in fn. 5).

*Notice of Proposed Action*

Richmond's Human Resources Management Department (HR Department) thereafter issued a notice of proposed action to impose a 120-hour suspension without pay.  The notice recited that the proposed action was based on the interview summaries and the two sustained allegations recounted in the investigative report.

As to the first charge, sexting, the notice identified excerpts of a December 26, 2015 off-duty exchange (that Sergeant Johanson had highlighted), in which Hill started at 4:31 p.m. with " 'Hey' " and, about 19 minutes and 17 texts later lead to the following (after Abuslin altered the tenor of the texting to sexting):

> "[H]:  'I wanna play with those titties'
> "[A]:  'U can play with my titties all u want.  Lick them, fuck them, cum on them'
> "[H]:  'I will.  What else'
> "[A]:  'Anything u want I'm submissive'
> "[H]:  'Will I have to pick you up?'
> "[A]:  'I want to be your bitch'
> "[H]:  'I have to see ID and interview . . ."
> "[H]:  'Send a pic of your nippies'
> "[A]:  'WOW nice'
> "[H]:  'Call me when ur done . . . you sounded afraid, I don't need problems'
> "[A]:  'Hi daddy, last thing I need is problems, I've been 207nd [kidnapped] 3 times in the past 4 years so I'm traumatized is all and have kept it a public setting'
> "[A]:  'That's why I stick to people in your profession.' "

The notice also identified a December 30th exchange while Hill was on duty:

> "[H]:  'What time you want me to pick u up?'
> "[A]:  'When.  I'm 4mo pregnant k.'
> "[H]:  'By who baby?'
> "[A]:  'Idk'
> "[H]:  'Really?  How many guys you fuck?' "

6

The notice stated Hill's "conduct, as described above and documented in the attached materials, was disgraceful, unbecoming of a member of this Department, contrary to the good order and morale of the Department, adversely affected the employee/employer relationship"[8] and violated each of the four Policy Manual provisions Sergeant Johansen had identified. In addition, under City Personnel Rule X, discipline could " 'be based on reasons other than those specifically mentioned.' " In that regard, the notice stated, "Engaging in sexually-charged text exchanges with an 18 year old while assigned as the Youth Services Lieutenant, and having some of your disgraceful conduct published in local newspaper articles that reflected unfavorably on the Department and its members, constitute independent causes for discipline under the City Personnel Rules."

As to the second "charge," engaging in oral sex on Match 24th, the notice stated, "While the Youth Services Division Lieutenant, you engaged in 'sexting' exchanges over the course of approximately four months, which ultimately resulted in engaging in oral sex with Ms. Abuslin. At [a] minimum, you knew she was an 18-year old girl with a background of traumatic incidents–an at-risk youth you were charged to protect, not exploit. Your conduct was unbecoming a member of the Department and contrary to good order, efficiency and morale of the Department and its members. The behavior reflected unfavorably upon the Department and its members as reflected in the published media reports referenced in charge One." The notice referenced each of the three Policy Manual provisions Sergeant

---

[8] The notice pointed out that on or about June 30th, Hill had been identified in media reports as one of a number of Richmond officers "who had sex" with Abuslin. The text messages "arranging for" and after the "sexual contact" on March 24th were also published. These articles "reflected unfavorably upon the Department and its members."

7

Johansen had identified. The notice further stated the conduct violated City Personnel Rule X as "[c]onduct unbecoming an employee" and as "[i]mmoral or disorderly conduct." "Engaging in oral sex with a troubled 18 year old girl while assigned as Youth Services Division Lieutenant constitutes independent cause for discipline under the City Personnel Rules."

The notice concluded by stating, "The public and Richmond Police Department trusts that a police officer will protect and serve citizens with honesty, integrity, and as a model of exemplary behavior-both on- and off duty. Additionally, the Richmond Police Department trusts that, as a supervisor, your actions will serve as an example to your subordinates. Your conduct with Ms. Abuslin destroyed the public's trust and the Department's trust in you. You participated in 'sexting' and oral sex with a troubled 18-year old girl. Your conduct was publicized and embarrassed the Department and its members. Only due to your commendable service during your 22-year career was this recommended discipline no more severe. Please be advised that any future similar conduct will result in your termination from employment."

The notice advised Hill of his right to a "*Skelly*" hearing,[9] which Hill chose not to exercise.

*City Manager's Rejection of Police Chief's Recommended Discipline*

The City Manager rejected the Police Chief's disciplinary recommendation, stating, in pertinent part:

"[A] 120-hour suspension without pay, is insufficient to address the very serious and inappropriate behavior that Lieutenant Hill engaged in with an 18-year old at-risk youth. . . . The behavior outlined in the . . . Notice of Proposed Action, can only be described as predatory behavior on the part of Lieutenant Hill. Lieutenant Hill was the Lieutenant over the Youth Service Division. As such, he knew or

---

[9] *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*).

8

should have known that Ms. Abuslin was an at-risk youth with drug addiction issues, and was someone who had been and/or was currently a sex worker. Instead of trying to provide assistance to Ms. Abuslin, as a trained Lieutenant in the Youth Services Division should have done. Lieutenant Hill began sending inappropriate, sexually explicit text[s] to the 18-year old, and then engaged in a physical relationship with her of a sexual nature. The full content of the inappropriate conduct is outlined in the . . . Notice of Proposed Action.

"Based on Lieutenant Hill's conduct, and the fact that he was the Lieutenant over the Youth Services Division, I find his lack of judgment, and his predatory behavior toward an 18-year [old] at-risk drug addicted youth, cannot be properly addressed with a suspension. The appropriate level of discipline should be termination."

The HR Department issued a new notice of proposed action, dismissal, advising Hill of his right to a *Skelly* hearing. Hill requested a hearing.

*The Skelly Hearing*

The hearing officer, Richmond Fire Chief Adrian Sheppard, reviewed, *inter alia,* the investigative report, the text messages, the initial notice of proposed action, the City Manager's letter rejecting the recommended disciplinary action, and heard comments by Hill and argument by counsel.

Chief Shepard agreed there was insufficient evidence to conclude Hill knew Abuslin was a sex worker or had an addiction problem when he began sexting with her. He also agreed Hill's conduct could not be characterized as "predatory."

However, he concluded that "the text messages and investigative report clearly supported a finding that [Hill] exercised indifferent judgment and participated in sometimes graphic exchanges and oral sex with a troubled 18-year old woman." The "text exchange in which Abuslin described having been kidnapped three time in the past four years and being traumatized should have been enough to have stopped [Hill] in his tracks. Instead, [Hill]

9

continued and repeatedly asked Abuslin how old she was, then went to her mother's home to receive oral sex." These actions ran " 'completely contrary to the conduct expected of any public safety officer but are especially egregious when a 22-year veteran supervisor assigned to the Youth Services Division commits them.' "

Based on all the facts, including Hill's "long and unblemished history with the Department," Chief Sheppard recommended that Hill's employment not be terminated, but he be demoted two ranks to the rank of police officer.

*City Manager's Rejection of Hearing Officer's Recommended Discipline*

The City Manager, citing to dictionary definitions of the terms, reiterated his view that Hill both "exploited" Abuslin and acted in a "predatory" manner. He also did not consider the sexual conduct "consensual" because he felt Hill "took advantage of his inherently unequal bargaining power in the relationship with Abuslin, a youth who was incapable of exercising good judgment or making decisions for herself." Hill had ignored "numerous signs that Abuslin was an at-risk youth" and took "advantage of her instead of following up on the troubling indications in order to protect her."

While the City Manager acknowledged three of the allegations against Hill had not been sustained, he considered Hill's conduct outside " 'anything that should be considered appropriate or excusable conduct for a police officer.' " He was particularly disturbed that Hill engaged in the conduct while assigned to the Youth Services Division.

10

*Administrative Law Judge's Decision*

Hill filed an administrative appeal, and in April 2018, the ALJ, sitting in place of the City Personnel Board, issued a lengthy decision.

The ALJ found the facts pertinent to the two charges of misconduct to be as follows:

"In the fall or winter of 2015, [Hill] was contacted by Abuslin through Facebook. She asked to 'friend' him. [Hill] did not know Abuslin, but noted that they had a number of mutual Facebook friends, including Police Chief Allwyn Brown, other Richmond Police Department officers, a member of the Richmond City council and a Richmond Deputy City Attorney. . . . [Hill] accepted the friend request.

"On a date not established by the evidence, Abuslin contacted [Hill] via Facebook private messenger. Initially, they engaged in general conversation. The photographs of Abuslin posted on Facebook were sexually suggestive and featured her in tight-fitting and low-cut clothing. Their messenger communications escalated to provocative subjects and Abuslin offered to send [Hill] nude photographs of herself, which [Hill] accepted. As their relationship developed, they exchanged cell phone numbers and began texting one another on December 26, 2015.

"Between December 26, 2015, and April 25, 2016, [Hill] and Abuslin exchanged 324 text messages over [a total of] 15 days. [Hill] asked Abuslin to be discreet about their relationship. All texting occurred on [Hill's] personal cell phone. . . . Of the 324 messages, 50 to 60 occurred on five days while [Hill] was on duty. Unbeknownst to [Hill], Abuslin engaged in this conduct with other police officers, including officers in other cities and several others employed in Richmond.

"The messages contained sexually explicit innuendo and content, commonly referred to as 'sexting.' . . . [The ALJ quoted part of the ' "play wit those titties" ' exchange, beginning at 4:44 p.m. on December 26.] [¶] . . . [¶]

"At 6:18 p.m. on December 26 . . . , Abuslin sent a text message to [Hill] stating: 'I've just been 207nd 3 times in the past 4 years so I'm traumatized is all and have kept it in a public setting since,' and at 6:20

11

p.m. Abuslin sent a text stating, 'That's why I stick to people in your profession.' [Hill] responded, stating 'Call me.' [Hill] had interpreted her text to be a reference to Penal Code 207 that defines punishment for kidnapping. When [Hill] spoke to her about it later, Abuslin laughed and downplayed the statement. Abuslin often joked and giggled on the phone. [Hill] later sent her a text stating, 'All good . . . but don't got time for games, or kidnaps.'

"[Hill] was aware that Abuslin's mother was a police dispatcher with the City of Oakland and thought Abuslin was citing Penal Code references to impress him. Kidnappings are rare in Richmond and [Hill] would very likely have been aware of it if a Richmond resident had been kidnapped three times; he considered her statement to be far-fetched and a joke.

"On December 30 . . . , around 4:00 p.m., [Hill] engaged in sexting with Abuslin again. She sent a message to him at 4:22 p.m. stating that she was four months pregnant. [Hill] again considered the statement to be provocative banter and a joke.

"Abuslin next contacted [Hill] on January 21, 2016, initiating sexting. Abuslin invited [Hill] to come to the home she shared with her mother, but he was unavailable.

"On January 24 . . . , at 12:33 p.m., Abuslin contacted [Hill] stating that she had just awakened after 'they hit me with a 5150 sleeping shot.' [Hill] understood Abuslin to be referring to Welfare and Institutions Code section 5150, which allows for an involuntary commitment. . . . [Hill] again believed Abuslin was joking, or trying to impress him.

"On January 26 . . . , Abuslin invited [Hill] over to see her. [Hill] asked about identification; he wanted to confirm Abuslin was an adult. . . . Abuslin assured him she was 'legal' stating she had lost her identification in Puerto Rico, but had a passport to show him. They did not meet.

"[Hill] and Abuslin next had brief contact on March 5. . . . On March 17 . . . [Hill] asked Abuslin if she had a fiancé based on a Facebook post. Abuslin replied she was getting married the following day to someone she had met the previous day. [Hill] again considered this to be provocative banter. [¶] . . . [¶]

12

"On March 24 . . . , Abuslin contacted [Hill] at 5:23 p.m., inviting him over because her mother was leaving. . . . [Hill] was off-duty. [Hill] agreed and went to Abuslin's residence. [Hill] asked Abuslin how old she was and when she told him she was 18 years old, he demanded to see her driver's license; she showed him an identification card confirming her age. [Hill] was satisfied Abuslin was an adult. Abuslin performed oral copulation on [Hill] while he was in her home. He estimates that he was in the home for approximately 15 minutes.

"When [Hill] was leaving, Abuslin advised him that she was using 'powder.' He counseled her to get off drugs and followed up with a text message after he left. She replied by text, agreeing to flush the drugs down the toilet. . . . After learning that Abuslin was using illegal drugs, [Hill] decided to distance himself from her; he did not offer to assist her in seeking help for drug use. [¶] . . . [¶]

"[Hill] did not have contact with Abuslin again until April 19 . . . , when she sent him a text message stating, 'So you were the weak link?!' [Hill] did not understand the comment and responded asking, 'When.' Abuslin responded, 'Why u did this to me,' then 'I was nothing but kind and good to you andre.' [Hill] responded by text stating: 'Are you kidding me? Are you serious?' Abuslin replied, 'My feelings are so hurt andre' and 'I just want to know what u got out of it,' 'That is all,' and 'Or just for laughs.' [Hill] responded asking, 'Got out of what?' [Hill] did not know what Abuslin was referring to; this exchange occurred around the time that Abuslin's relationship with several Oakland police officers was surfacing.

"Abuslin sent another 22 text messages to [Hill] between 12:18 a.m. and 7:32 a.m. The messages continued to demand to know 'why' and stated she hated [Hill]. [Hill] responded at 7:33 a.m. asking Abuslin if she had 'slept at all.' Abuslin replied that she had not. [Hill] stated he had to get ready for work and asked her to stop sending text messages to him. Abuslin continued sending text messages accusing [Hill] of being two-faced and talking about her. At 7:52 a.m., [Hill] sent a text message to Abuslin stating, 'Listen, I don't know what you['re] talking about and I don't know anything to say about you. . . .' Abuslin continued to send text messages. At 9:21 a.m., [Hill] sent Abuslin a text message stating he would call her when he was done with his meeting. Abuslin sent another 25 text messages to [Hill] before he was

13

able to call her.  [Hill] tried to calm her down, but eventually just stopped responding.

"[Hill] received several additional text messages from Abuslin on April 25 . . . ; he did not respond. [¶]  . . . [¶]

"Two to three weeks thereafter, journalists . . . reported that a young woman (Abuslin) was claiming to have been sexually involved with a number of police officers from the Oakland Police Department. . . .

"Abuslin disclosed to the media the names of Oakland police officers with whom she claimed to have been involved sexually.  The Oakland Police Department opened an investigation. . . .  In late May or early June 2016, Abuslin named five officers in the Richmond Police Department, including [Hill].

"Media outlets described Abuslin as having had a difficult upbringing and being 'a survivor of child sex trafficking.'  Abuslin was addicted to heroin and was working as a prostitute, although there is no record of her being arrested for or convicted of prostitution or any other criminal offense.

"The media articles quoted text message exchanges between [Hill] and Abuslin . . . ; the news coverage reflected unfavorably on the Department.  Members of the public, and the school authorities where resource officers worked, contacted the Police Chief expressing outrage and their concern about [Hill's] misconduct."  (Fn. omitted.)

The ALJ found the evidence supported both of the charges—"sexting" and oral sex with Abuslin on March 24—that had been sustained during the administrative investigation.  The ALJ identified and relied on the same Policy Manual provisions as had the investigating officer Johanson.

The ALJ rejected Hill's argument that he could not be disciplined on the basis of private sexual practices that did not affect the workplace.  While "[c]ase law establishes that a police officer cannot be terminated on the basis of private sexual practices that do not affect the workplace . . . [Hill] was

14

disciplined not because he engaged in private sexual practices, but because he used poor judgment in pursuing a relationship with a troubled youth while he was serving as the lieutenant of the Youth Services Division. Moreover, the conduct did affect the workplace in that after the media reported on the conduct members of the public lost trust in [Hill] and in the Department." "The suggestive photographs Abuslin posted on Facebook, the fact she had recently turned 18, and her willingness to engage in sexting and sexual contact with someone she had never met, were all signs that she was very troubled." Even assuming Hill considered some her comments to be provocative banter, "her troubled behavior as a whole, especially in light of his training and position, demonstrated a very serious lapse in judgment."

The ALJ found, however, that while Hill "should have ignored [Abuslin] entirely from the start, or attempted to help her when she demonstrated troubled behavior," the evidence did "not establish that [Hill] engaged in predatory behavior."

The ALJ further found, that while Hill's "misconduct was very serious," it did not warrant dismissal. The conduct "occurred during a short period of time during [Hill's] 22 years at the Department," he had "otherwise lived a law abiding life and ha[d] given much to the people of Richmond," and it "is very unlikely that [Hill] will repeat his misconduct." He "distanced himself after meeting [Abuslin] in person and learning she was using illegal drugs." Hill's conduct was not unlawful, and he acknowledged his conduct was wrong and was genuinely remorseful. Weighing the factors pertinent to public employee discipline set forth in *Skelley*, the ALJ concluded "termination is excessive," and recommended Hill be demoted to the rank of police officer.

*City Manager's Rejection of the ALJ's Recommended Discipline*

The City Manager reviewed the ALJ's "findings and recommendations, as well as some of the exhibits presented at the hearing." He "agree[d] with most of [the ALJ's] factual findings," but disagreed with her recommendation that Hill be reinstated and demoted to the rank of police officer. In the city manager's "view, the facts [the ALJ] found to be true permanently precluded [Hill] from working in any capacity" for the Richmond Police Department. "[R[egardless of rank, [an officer] must demonstrate sound and ethical judgment, must behave in a manner that does not discredit the officer or the agency, and must always strive to uphold the public trust."

He then stated in pertinent part:

> "Your tenure at the Police Department, and any remorse you expressed, do not overcome the egregious lapses in judgment you demonstrated for several months while pursuing sex with an obviously troubled 18 year-old girl while on and off duty. As a result of your selfish and unethical actions, you discredited yourself and the Richmond Police Department, and irrevocably damaged the public's trust, and my trust, in your commitment to serving and protecting the City's most vulnerable citizens. [¶] For these reasons, I cannot in good conscience reinstate you to the position of Police Officer. I hereby uphold my original decision that you remain terminated from employment."

*Administrative Mandamus Proceeding*

Hill filed an administrative mandamus proceeding challenging his dismissal. After exercising its independent judgment based on the evidence, and considering briefing and argument, the trial court denied the writ petition.

The trial court's findings were essentially the same as those of the ALJ. Among other things, the court concluded there was ample basis for the view that Abuslin was a "troubled and at-risk youth" that Hill "was charged to

16

protect." The court also rejected Hill's assertion he was unlawfully disciplined for "private, off-duty sexual relations between consenting adults."

As for the discipline imposed, dismissal, the trial court observed that both the Police Chief and the *Skelly* hearing officer indicated dismissal was within the realm of reasonable disciplinary options. The court concluded the city manager's choice of termination was not an "arbitrary, capricious or patently abusive exercise of discretion."

## DISCUSSION

### *Grounds for Discipline*

#### *Standard of Review*

Code of Civil Procedure section 1094.5, subdivision (b), provides that "[t]he inquiry in [an administrative mandamus] case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any *prejudicial* abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Italics added.) Code of Civil Procedure section 1094.5, subdivision (c), states: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."

"If the decision of an administrative agency will substantially affect [a fundamental vested] right, the trial court not only examines the administrative record for errors of law but also exercises its independent judgment upon the evidence disclosed in a limited trial de novo." (*Bixby v. Pierno* (1971)

17

4 Cal.3d 130, 143 (*Bixby*), fn. omitted.) When applying the independent judgment test to the evidence, "a trial court must accord a ' "strong presumption of . . . correctness" ' to administrative findings. . . ." (*Fukuda v. City of Los Angeles* (1999) 20 Cal.4th 805, 816-817 (*Fukuda*).) "[T]he 'burden rests' upon the complaining party to show that the administrative ' "decision is contrary to the weight of the evidence." ' " (*Ibid.*) However, "[b]ecause the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Id.* at p. 818.)

"Where a superior court is required to make such an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited." (*Pasadena Unified School District v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 (*Pasadena Unified*).) "[T]he standard of review *on appeal* of the trial court's determination is the substantial evidence test." (*Fukuda, supra*, 20 Cal.4th at p. 824, italics added.) "[A]n appellate court determines whether the independent 'findings and judgment of the [trial] court are supported by substantial, credible and competent evidence' in the *administrative record*." (*Paratransit, Inc. v. Unemployment Ins. Appeals Bd.* (2014) 59 Cal.4th 551, 562, italics added; see *Bixby, supra*, 4 Cal.3d at p. 143, fn. 10 ["After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence."].)

"In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When

more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court." (*Pasadena Unified, supra*, 20 Cal.3d at p. 314.) " 'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

The appellate court reviews questions of law de novo. (See *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204.)

### *Challenges to Trial Court's Decision*

Hill first advances a substantial evidence challenge to the trial court's finding that Abuslin was "a troubled and at-risk youth."[10]

As we have recited, Abuslin was so described in the initial notice of proposed action (120 hours of suspension without pay). Thereafter, she was so described in the city manager's rejection of the proposed suspension, in the second notice of proposed action (dismissal), in the *Skelly* hearing officer's decision,[11] in the city manager's rejection of the hearing officer's recommended demotion, in the ALJ's decision , and in the city manager's rejection of the ALJ's recommended demotion and affirmation of Hill's dismissal.

Hill maintains no reasonable person could conclude he was aware, or should have been aware, that Abuslin was "a troubled and at-risk youth." He

---

[10] Respondent asserts Hill has waived any substantial evidence challenge to the trial court's findings because he has cited to findings by the ALJ and has not fairly set forth all the evidence. We have no difficulty, however, in understanding that Hill is attacking the trial court's finding, and while he has certainly focused on the evidence that is helpful to him, we do not think his briefing is so one-sided as to result in forfeiture of the issue.

[11] The hearing officer referred to Abuslin as a "troubled 18-year old woman."

points out she was 18 years old and legally an adult. He also claims there "were no red flags" that Abuslin was "troubled," pointing out he did not discover she had a drug problem until the March 24th sexual encounter, after which he rapidly disassociated himself from her. He continues to maintain, as he did during the administrative investigation, the *Skelly* hearing, and the hearing before the ALJ, that the only reasonable conclusion that can be drawn—given the context and manner in which Abuslin stated she had been kidnapped three times, was pregnant, and had just been subject to a Welfare and Intuitions Code section 5150 hold—is that Abuslin was joking and this was all provocative banter.

Hill misses the forest for the trees. Regardless of whether Abuslin was "legally" an adult, she was only 18 years old and could appropriately be characterized as a "youth"[12]; she certainly was not a mature, adult woman. And, as the ALJ observed, the "suggestive photographs Abuslin posted of herself on Facebook, the fact she had recently turned 18, and her willingness to engage in sexting and sexual contact with someone she had never met, were all signs that she was very troubled." In addition, Abuslin offered nude photographs of herself to Hill (which he accepted) and *repeatedly* initiated the sexting. Add to that that on the first day Abuslin and Hill engaged in texting and sexting (December 26th), Abuslin claimed to have been kidnapped three times, that four days later (on December 30th) she stated she was four months pregnant, and that a month later (on January 24th) she claimed she had been subject to a Welfare and Intuitions Code section 5150 hold—there

---

[12] Youth is defined as, "The time when one is young; the early part or period of life; more specifically, the period from puberty till the attainment of full growth, between childhood and adult age." (Oxford English Dictionary, https://oed.com/view/Entry/232184?redirectedFrom=youth#eid [as of June 30, 2021].)

were abundant signs Abuslin was not an emotionally healthy 18 year old. Even if Hill thought Abuslin was "joking" and engaging in provocative "banter," this was not the behavior of a solidly grounded 18-year old.

Hill next maintains he was terminated on an unlawful basis, namely a "singular, lawful private sexual encounter with a consenting adult." (Some capitalization omitted.) As we have recited, Hill also advanced this argument before the ALJ and the trial court, citing the same cases he cites on appeal.[13]

Hill is correct, as the ALJ and trial court both recognized, that police officers have privacy and associational rights with respect to intimate and sexual off-duty relationships. (See *Bautista v. County of Los Angeles* (2010) 190 Cal.App.4th 869, 875-876 (*Bautista*); *Perez v. City of Roseville* (9th Cir. 2019) 926 F.3d 511, 519-523 (*Perez*).)

---

[13] These include *Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 218-220 [teacher could not be disciplined on basis of private, homosexual relationship; allegations of "immoral" conduct must have some nexus to employee's ability to perform duties]; *Warren v. State Personnel Bd.* (1979) 94 Cal.App.3d 95, 105 [officer could not be dismissed because his sexual preference was offensive to co-workers; "dismissal cannot be based on lawful, sexual acts conducted in the privacy of a home which do not indicate unfitness for a particular employment"]; *Smith v. Price* (5th Cir. 1980) 616 F.2d 1371, 1373-1375 [while officer's off-duty extra-marital affair, alone, was insufficient to warrant disciplinary action, other aspects of the relationship, e.g., engaging in gunplay that resulted in injury and property damage, on-duty visits to woman's residence, lying to investigators about the affair, and women taking officer's gun and gun-belt from his private vehicle, were proper bases for dismissal]; *Shuman v. City of Philadelphia* (E.D. Pa. 1979) 470 F.Supp. 449, 452, 459 [officer, who was in process of separating from spouse and was also a university student, could not be dismissed for affair with a fellow university student who was 18 years old and whose parents claimed she had been "lured away" from her home and hounded the police department to " 'press charges' " against the officer; "a police officer's private life and sexual behavior . . . are simply beyond the scope of any reasonable investigation" where there is a "tenuous relationship between such activity and the officer's performance"].)

Nevertheless, law enforcement officers may be disciplined for off-duty misconduct that undermines the public's confidence in the agency or department. (See *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 571–572 ["[W]hile the off-duty conduct of employees is generally of no legal consequence to their employers, . . . [t]o maintain the public's confidence in its police force, a law enforcement agency must promptly, thoroughly, and fairly investigate allegations of officer misconduct; [and] if warranted, it must institute disciplinary proceedings"]; *Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 760, 771 (*Cranston*) [upholding discharge of off-duty police officer who led fellow police officers and highway patrol car on high speed chase].)

This includes private conduct that is sexual in nature that brings "embarrassment and discredit to the law enforcement agency he served." (*Anderson v. State Personnel Bd.* (1987) 194 Cal.App.3d 761, 764, 771-772 (*Anderson*) [upholding dismissal of off-duty highway patrol officer who several times went naked in his house and yard, in full view of his neighbors]; *Bautista, supra,* 190 Cal.App.4th at pp. 878-879 [upholding dismissal of deputy sheriff for maintaining relationship with a known prostitute and heroin addict; deputy's open association "embarrassed the Department and undermined its reputation in both the law enforcement community and the public it is charged with protecting"]; see *Perez, supra,* 926 F.3d at p. 521 [there is no per se protection from discipline for sexual behavior " 'that is not purely private, that compromises a police officer's performance, and that threatens to undermine a police department's internal morale and community reputation,' " quoting *Fugate v. Phoenix Civil Service Board.* (9th Cir. 1986) 791 F.2d 736, 741].)

22

Discipline for off-duty misconduct is justified if: "1) the misbehavior [causes] discredit to the agency; and 2) there [is] a rational relationship between the misconduct and the person's employment." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 50 (*Deegan*).) "The nature of the misbehavior and its effect on the public service rather than the time or place of its occurrence should be the determinative factors. If the misconduct bears some rational relationship to the employment and is of a character that can reasonably result in the impairment or disruption of public service, it should be no less a cause for discipline . . . simply because it occurred outside of duty hours. In determining whether an employee should be disciplined, whatever the cause, the overriding consideration is whether the conduct harms the public service." (*Blake v. State Personnel Board* (1972) 25 Cal.App.3d 541, 550-551.)

Hill was not found to have violated the Policy Manual Ethics Code and its "conduct unbecoming" and "PCD use" provisions, and Personnel Rule X on the basis of a "singular" private sexual encounter between consenting adults. As the recitation of the facts as found by both the ALJ and the trial court shows (facts that are supported by substantial evidence), there was much more involved in the milieu here, leading to and the result of, the one-time sexual encounter. Nor was this a consensual relationship between two *mature* adults. While Abuslin may have been of "legal" age, her conduct from virtually the outset of her seeking Hill out on Facebook, was not within the norm for an emotionally healthy 18-year old. In addition, this relationship spilled over into on-duty time; indeed, some of the texting (although by no means all of it, or even the majority of it) took place while Hill was on-duty. Finally, the relationship, which was beset with yellow flags from the outset, became public and placed the Richmond Police Department in a poor light

and undermined public confidence in the Department and in Hill, specifically.[14]

Finally, Hill asserts the trial court errored in ruling the city manager's final decision—the operative administrative decision—comported with the requirements of a *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 (*Topanga*). Specifically, he claims the decision is deficient because the city manager did not list the "specific facts" supporting the termination decision, pointing out the city manager stated he "agree[d] with most of [the ALJ's] findings." Hill maintains this is significant because the ALJ found he "had no prior knowledge of Abuslin's drug use and terminated the relationship after learning about it," but there is "no indication" whether the city manager agreed or disagreed with this assertedly "objective important finding."

*Topanga* does not require an agency to make formal findings akin to those made in a judicial proceeding. " ' "[A]dministrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein." [Citation.] An agency's findings under Code of Civil Procedure section 1094.5 "*do not need to be*

---

[14] That Hill never intended for the relationship to become public is beside the point. (See *Orlandi v. State Personnel Board* (1968) 263 Cal.App.2d 32, 37 [traffic officer dismissed for " 'fixing' " ticket; discipline could be imposed for "conduct which would reflect discredit on the employing agency or the position held by the person engaging in such conduct, regardless of whether publicized or not"]; cf. *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1029, 1050 (*Seibert*) [reversing dismissal of firefighter-paramedic and remanding on several grounds, including that the department's disciplinary policies were not sufficiently specific to include sexting, but observing "[i]t may well be that indiscriminate exchanges of salacious messages with *relative strangers* on company time creates an undue risk of embarrassment or even scandal" to a department].)

*extensive or detailed.*"  [Citation.]  "In addition, findings are to be liberally construed to support rather than defeat the decision under review." [Citation.]'  (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 421. . . ; see also *Topanga, supra,* 11 Cal.3d. at p. 514 ['the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision'].)"  (*Alpha Nu Association of Theta Xi v. University of Southern California* (2021) 62 Cal.App.5th 383, 414; accord *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516.)

The key is whether we can "trace and examine the agency's mode of analysis."  (*Topanga, supra,* 11 Cal.3d. at p. 516; *Oduyale v. California State Bd. of Pharmacy* (2019) 41 Cal.App.5th 101, 115.)  The city manager's decision leaves no doubt as to his mode of analysis.  Indeed, it is clear the city manager did not take issue with *any* of the findings by the ALJ.  Rather, he stated "the facts [the ALJ] found to be true," in his view, "permanently preclude [Hill] from working in any capacity at the Richmond Police Department."   The city manager then went on to explain why he held that view—because all sworn officers, "regardless of rank, must demonstrate sound and ethical judgment, must behave in a manner that does not discredit the officer or the agency, and must always strive to uphold the public trust." He then described why Hill had, in his view, not done so.

Thus, not only did the city manager accept the ALJ's finding that Hill did not know until the March 24th sexual encounter that Abuslin used illegal drugs, it is not the pivotal finding Hill makes it out to be, for all the reasons we have discussed above.  And while Hill asserts the city manager's decision was so deficient he faced "an impossible guessing game of what findings, if

25

any, to refute," his briefing in the trial court and on appeal do not indicate he was handicapped in any respect in presenting his case.

### *Discipline Imposed*

#### *Standard of Review*

" '[In] a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.' " (*Skelly, supra,* 15 Cal.3d at p. 217; accord, *County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877 (*County of Los Angeles*).) "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber v. State Personnel Board* (1976) 18 Cal.3d 395, 404; accord, *Bautista, supra,* 190 Cal.App.4th at p. 879; *County of Los Angeles*, at p. 877 ["The court may not substitute its own judgment for that of the Commission, nor 'disturb the agency's choice of penalty absent " 'an arbitrary, capricious or patently abusive exercise of discretion' " by the administrative agency' [citation], but must uphold the penalty if there is any reasonable basis to sustain it."].)

"The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination." (*Deegan, supra,* 72 Cal.App.4th at p. 46; accord, *Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 284.) "Only in an exceptional case will an abuse of discretion be shown because reasonable minds cannot differ on the appropriate penalty." (*County of Los Angeles, supra*, 40 Cal.App.5th at p. 877; accord, *Bautista, supra*, 190 Cal.App.4th at p. 879.)

"In considering whether . . . abuse occurred in the context of public employee discipline, . . . the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to

result in, '[harm] to the public service.' " (*Skelly, supra*, 15 Cal.3d at p. 218; accord, *County of Los Angeles, supra*, 40 Cal.App.5th at p. 878 [same]; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721 (*Kolender*) [" 'The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.' "].) "Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, at p. 218; accord, *County of Los Angeles*, at p. 877.) "Whether an employee's conduct has resulted or is likely to result in harm to the public service if repeated requires consideration of the nature of the employee's profession, because 'some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields.' " (*County of Los Angeles*, at p. 878; accord, *Cate v. State Personnel Bd., supra*, 204 Cal.App.4th at p. 285.)

A police officer's job " 'is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties.' " (*Kolender, supra*, 132 Cal.App.4th at p. 721; accord, *County of Los Angeles, supra*, 40 Cal.App.5th at p. 878 ["[p]eace officers specifically are held to higher standards of conduct than civilian employees"].) Law enforcement officers " 'are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them.' " (*Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1224; accord, *County of Los Angeles*, at p. 879.)

The appellate courts have, in a number of cases, upheld the discharge of law enforcement officers where the officers' conduct resulted in harm to their departments and public service. (E.g., *Cranston, supra,* 40 Cal.3d at pp. 772-773 [upholding dismissal of officer who, while off-duty and driving his personal vehicle, led fellow officers on high speed chase]; *County of Los Angeles, supra,* 40 Cal.App.5th at pp. 878-880 [commission abused its discretion in reducing deputy sheriff's discharge to 30-day suspension where deputy failed to report fellow deputy's use of force and lied during investigation]; *Bautista, supra,* 190 Cal.App.4th at pp. 879-880 [upholding dismissal of deputy sheriff for maintaining relationship with a known prostitute and heroin addict]; *Kolender, supra,* 132 Cal.App.4th at pp. 718-719, 721-722 [civil service commission abused its discretion in reducing deputy sheriff's penalty from dismissal to 90-day suspension where deputy lied about another deputy's physical abuse of an inmate]; *Anderson, supra,* 194 Cal.App.3d at pp. 766, 772. [upholding dismissal of highway patrolman who had been warned to "take measures against being seen publicly nude" but who again appeared nude in his backyard and house, visible to neighbors; officer's off-duty activity "harmed the reputation of the CHP and undermined the effectiveness of his relations with other officers"]; *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 503-504 [upholding dismissal of officer who, as instructor during firearm training session, aimed and fired a blank at a fellow officer to illustrate importance of wearing bullet proof vest at all times; while the misconduct "might reasonably be reviewed by some as relatively innocuous," it "could also reasonably by viewed, as it was by the city council, as demonstrating a severe lack of good judgment and indifference to safety and official regulations"]; cf. *Seibert, supra,* 247 Cal.App.4th at p. 1050 [reversing dismissal of firefighter-paramedic and remanding for further

28

proceedings; but noting court had "little doubt a firefighter-paramedic's exchange of sexually charged messages with a minor can expose the Department to disrepute" and be a basis for discipline].)

Hill relies on *Blake v. State Personnel Board* (1972) 25 Cal.App.3d 541, wherein the appellate court majority concluded dismissal was excessive discipline for a single incident of inappropriate off-duty conduct. (*Id.* at pp. 553-554.) In that case, a supervising deputy labor commissioner, who had been issued a handgun, drew the gun on two labor department attorneys after they approached the deputy, who had followed them in his car as they walked back to their lodging at a state bar convention with other attorneys, two of whom were women, following a late dinner. (*Id.* at pp. 545-547.) The deputy had had a relationship with one of the women. (*Id.* at p. 554.) The deputy, who remained seated in his car, told the two attorneys (who were men) that " 'his boys' " had told him " 'a couple of "punks" ' " had been bothering one of the women and he did not " 'want the attorney fooling around' " with her. (*Id.* at 547.) While the panel majority concluded there was a sufficient nexus between the misconduct and the deputy's employment to warrant disciplinary action (*id.* at p. 551), it concluded dismissal was excessive. (*Id.* at pp. 553-554.)

The majority explained:

"Petitioner is 53 years of age and has been in state service since 1949. During his entire civil service career he has never suffered disciplinary action of any kind; his employment record is exemplary and is replete with commendations for meritorious service; his outstanding qualities have been recognized by his promotion to his position of supervising deputy labor commissioner.

"In determining whether the misconduct warranted dismissal, consideration should be given to the circumstances surrounding the misbehavior, the degree to which it affected the public service and the likelihood of its recurrence. In the instant case while we have concluded

29

that a reasonable inference could be drawn from the evidence to support the Board's finding of harm to the public service, there was no direct testimony from the two male attorneys that their work relationship with the female attorney was affected. . . . [W]hile the circumstances of its occurrence by no means excused petitioner's reprehensible conduct, it must be recalled that it did occur after a social evening during which the group had had several drinks during dinner and later at a bar.  The following morning petitioner called the two attorneys, apologized, and acknowledged to them the fact that his conduct the night before was unjustified and inexcusable and that it would not recur.  At the hearing petitioner testified that his relationship with the female attorney had been terminated, that he had sold his gun and no longer owned one and gave assurances that the incident would not recur.

"We note also that the State Personnel Guide to Employee Discipline, a copy of which was received in evidence, suggests penalties for a first offense under subsection (m) of a 'warning' and a maximum of a 'letter of reprimand.'  While the manual does not circumscribe the agency's discretion and penalties in excess of those suggested would not be unreasonable as a matter of law, the manual is evidence of the Board's policy and may, therefore, be properly considered in determining whether the penalty imposed in the instant case was excessive as a matter of law." (*Blake v. State Personnel Board, supra,* 25 Cal.App.3d at pp. 553-554.)

Thus, considering "all relevant factors," the panel majority concluded dismissal "was clearly excessive for [the] single incident," and remanded for reconsideration of the disciplinary penalty.  (*Blake v. State Personnel Board, supra,* 25 Cal.App.3d at p. 554.)

Hill, by contrast, was not involved in a single, late-night incident that lasted only minutes, and the public fallout from his conduct was far greater than interference with harmonious office relationships that occurred in *Blake*.

We recognize Hill's conduct did not involve any dishonesty and was not as egregious as the conduct in many law enforcement discharge cases, including most of the cases cited above.  We also recognize Hill had an

unblemished 22-year service record, that his conduct was not unlawful, that it involved only sporadic conduct over only a four-month period, and he disengaged himself from the situation as soon as he became aware Abuslin was involved in illegal drug use.  But we are not "free to substitute [our] discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber v. State Personnel Bd., supra*, 18 Cal.3d at p. 404; accord, *Bautista, supra*, 190 Cal.App.4th at p. 879.)  The city manager's assessment of Hill's conduct and disciplinary choice was harsh. However, both the Police Chief and the *Skelly* hearing officer (the Fire Chief) recognized that dismissal was within the range of reasonable discipline.  We therefore must conclude, as did the trial court, that this is not an "exceptional case" where "reasonable minds cannot differ on the appropriate penalty." (*County of Los Angeles*, *supra*, 40 Cal.App.5th at p. 877; accord, *Bautista*, at p. 879.)

## DISPOSITION

The judgment is AFFIRMED.

_____
Banke, J.

We concur:


_____
Margulies, Acting P.J.


_____
Sanchez, J.

A159322, Hill v. City of Richmond

32